CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

October 08, 2024
LAURA A. AUSTIN, CLERK
BY:
s/A. Beeson
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE  DIVISION

| | | |
|---|---|---|
| **ADIB EDDIE RAMEZ MAKDESSI,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:23CV00049 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **COLLINS, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |
| | ) | |

*Adib Eddie Ramez Makdessi, Pro Se Plaintiff; Debra M. Bryan and Richard C. Vorhis, Assistant Attorney General,* OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, CRIMINAL JUSTICE AND PUBLIC SAFETY DIVISION, *Richmond, Virginia, for Defendants Collins, Blevins,[1] and Turner.*

The plaintiff, Adib Eddie Ramez Makdessi, a Virginia inmate proceeding pro se, filed this civil rights case under 42 U.S.C. § 1983 as part of an omnibus, multi-defendant § 1983 action, No. 7:22CV00428.  By Opinion and Order in January 2023, the court severed his claims into several separate civil cases.  This action consists only of Claim 6 from the Amended Complaint in that prior case.[2]  Makdessi claims that while he was confined at Red Onion State Prison (Red Onion), defendant Collins

---

[1]  Based on the defendants' filings, I will direct the Clerk to amend the docket to indicate that Blevins is the correct spelling of the last name of the defendant identified in the Complaint as "Blevens."

[2]  In this Opinion and Order, when I cite to the Complaint or refer to Makdessi's claims, I refer to his allegations in Claim 6 as set forth in ECF No. 1 in this case.

retaliated against him for filing a lawsuit by assaulting him, denying him medical attention, and destroying his legal mail, and other defendants did not provide him access to medical care after the assault or take action against Collins. The matter is before me now on the defendants' Motion for Summary Judgment. After review of the record, including video footage, I conclude that the defendants' motion must be granted.

I.   BACKGROUND.

In Claim 6, Makdessi alleges the following events:

Collins assaulted and battered me again on 6-21-2022 because he discovered I am filing a law suit against him and S.T. White & others, in a Prior Notice I sent  him by informing him that I took notes from o.p. 401.1 about "USE OF FORCE" that proves in court that he did in fact assault and injured me without just cause in retaliations, Collins went crazy & assaulted me while cuffed by twisting my left injured shoulder & punched my neck & shoulder & slammed me into the wall causing me severe TORTURE & dragged me to C-4 segregation shower by threats, & locked me up in C-4 segregation shower for 3 hours, where I col[l]apsed 3 to 4 times, when all staff & medical knows I could no longer stand-up from aggr[a]vating my severe back & sciatica injuries in severe TORTURE, and Asst. Warden Blevins & D. Turner came & found out that Collins assaulted me & placed me in segregation shower for 3 hours pain & severe torture, and they all refused to call medical or take me to medical and they also found out that Collins shake my cell C-610 without my presence while locked-up in the shower, and Collins destroyed the law suit I had in a sealed & stamped envelope to be mailed out, and Asst. Warden Blevins & D. Turner did not do anything to Collins, instead, they placed me back in my handicapped cell & told me to forget about it and not to file a law suit that makes Collins angry. Collins threatened me again ("if you file a law suit I will take you out of handicapped cell status to cause you pain & suffering and have someone beat your ass"). ("Asst Warden Fuller is no longer in this prison to protect you") Collins threatened.

-2-

Compl. 6–7, ECF No. 1.[3]  The defendants are: Red Onion Assistant Warden Blevins, Unit Manager Larry Collins, and Officer D. Turner.  I liberally construe Makdessi's allegations in this case as asserting the following claims for relief under § 1983, related to the incident on June 21, 2022, at Red Onion:

1.  Collins used excessive force against Makdessi in retaliation for a lawsuit Makdessi was filing and denied him necessary medical care, in violation of the First and Eighth Amendments;

2.  Collins searched Makdessi's cell outside his presence and, in retaliation for his lawsuit, confiscated and destroyed a package containing that lawsuit, in violation of the First Amendment; and

3.  Blevins and Turner had knowledge of Collins' actions and Makdessi's injuries, but they were deliberately indifferent by failing to call for medical assistance and by filing to "do anything" to Collins.  *Id.* at 7.

As stated, the defendants, through counsel, have filed an Answer and a Motion for Summary Judgment,[4] to which Makdessi has responded, making the matter ripe for consideration.

---

[3]  Citations to the record in this case will use the document numbers and page numbers assigned by the court's electronic filing system in this case.

[4]  The defendants offer the following affidavits in support of their summary judgment motion: L. Collins (Collins' Aff.); C. Vilbrandt, Institutional Grievance Coordinator at Red Onion (Vilbrandt Aff.); T. Thornesberry, Correctional Officer (Thornesberry Aff.); and J. Bentley, Sergeant in the Intel Department at Red Onion (Bentley Aff.).  Mem. Supp. Mot. Summ. J., ECF No. 37.

II.   DISCUSSION.

A.   The Summary Judgment Standard.

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To preclude summary judgment, a nonmovant must present a "genuine" dispute as to a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law*." McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).[5]  The court "may not weigh the evidence or make credibility determinations." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir.1992).

---

[5]   I have omitted internal quotation marks, alterations, or citations here and throughout this Opinion and Order, unless otherwise noted.

Makdessi has presented his claims in this case under the First and Eighth Amendments and § 1983, a statute that permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "[C]ourts are obligated to liberally construe pro se complaints, however inartfully pleaded*." Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 (4th Cir. 2017). A pro se litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).

B.     Failure to Exhaust Administrative Remedies.

Defendants Blevins and Turner assert that they are entitled to summary judgment on the ground that Makdessi failed to exhaust administrative remedies as to his claims against them in this case. After review of the evidence, I agree.

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. This exhaustion requirement is "mandatory," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and "applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the prison facility provides to its inmates and

meet all deadlines within that procedure.  *Woodford v. Ngo*, 548 U.S. 81, 90–94 (2006).

Operating Procedure (OP) 866.1 is the written administrative remedies procedure that inmates in the custody of the Virginia Department of Corrections (VDOC) must follow to comply with § 1997e(a).  Mem. Supp. Mot. Summ. J. Vilbrandt Aff. ¶ 4 and Enclosure A, ECF No. 37-4.  All issues are grievable except disciplinary proceedings and matters outside the control of the VDOC.  Under OP 866.1, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally, which he may do by completing a Written Complaint (also known as an Informal Complaint or IFC) and submitting it to prison staff.  He should receive a written response on the bottom of the form within fifteen days.  If the issue in the IFC is not resolved to the inmate's satisfaction, he may then initiate the formal grievance procedure by filing a Regular Grievance (with the IFC attached).  "Only one issue per grievance form is addressed."  *Id.* ¶ 7.

When a Regular Grievance is properly filed, the Warden conducts a review of the inmate's submission and issues a Level I response.  If the inmate is dissatisfied with that determination, he can appeal to Level II for review by the Regional Administrator, Health Services Director, or other VDOC administrators, depending on the subject matter.  The inmate can appeal some issues to Level III.  Thus, for full

exhaustion, the inmate must submit his claim via an IFC, then a Regular Grievance, and then through all available levels of appeal in OP 866.1.

Vilbrandt reviewed Makdessi's grievance records regarding his claims in this case.  He submitted a Regular Grievance dated July 14, 2022, ROSP-22-REG-00217.  It complained that on June 21, 2022, Collins shook down his cell and destroyed an outgoing lawsuit mailing.  The Warden issued a Level I response, stating: "Per Major C. King, this was investigated by SIU [Special Investigations Unit] and deemed to be unfounded by the SIU Agent Lawson."  Vilbrandt Aff. Enclosure B, at 28, ECF No. 37-4.  Makdessi appealed this response.  The regional administrator respondent on August 17, 2022, upholding the Level I response.  He determined that the grievance was unfounded and he found no violation of policy.  This was Makdessi's last level of appeal on this grievance.

Makdessi submitted another Regular Grievance dated July 14, 2022, ROSP-22-REG-00218, complaining that Collins assaulted him on June 21, 2022, and ordered officers to lock him in the C-4 shower for three hours.  The grievance also claimed that Collins took these actions, knowing that they would cause Makdessi serious problems because of his medical issues.  The Warden issued a Level I response on August 18, 2022, stating that SIU was currently investigating

Makdessi's grievance, so no further action would be taken at that time.[6]  Makdessi

appealed.  The regional administrator responded on October 13, 2022, upholding the

Level I response.  He determined that the grievance was unfounded and did not

involve any policy violation.

Vilbrandt states that Makdessi's claims against Blevins and Turner are

grievable, in that he could have submitted grievances under OP 866.1 to express his

belief that their actions violated policy or his constitutional rights.  To satisfy the

exhaustion requirement in 42 U.S.C. § 1997e(a), a VDOC inmate must file a regular

grievance about the issue at stake, have it accepted as properly filed, and then appeal

it through the highest available level of appeals under OP 866.1.  Vilbrandt's

evidence shows that Makdessi did not file any grievances about any action or

omission by Blevins or Turner on June 21, 2022, and he offers no argument or

evidence showing otherwise.

On the record, I cannot find that Makdessi exhausted available administrative

remedies as to his claims against Blevins and Turner before filing this lawsuit.

---

[6]  Makdessi presents as evidence a letter from an SIU agent, stating that an "investigation has been completed and appropriate actions may be taken if required." Resp. Opp'n Ex. 5, at 3, ECF No. 43-1.  Therefore, he claims, a response to one of his grievances was fraudulent.  The letter does not indicate a specific allegation or grievance to which it pertains.  In any event, an inmate has no constitutional claim based merely on a prison official's allegedly erroneous response to a grievance procedure filing.  *Battle v. Ledford*, No. 7:16CV00020, 2017 WL 432822 (W.D. Va. Jan. 30, 2017) (quoting *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("[R]uling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation.").

Therefore, they are entitled to summary judgment pursuant to 42 U.S.C. § 1997e(a). Nothing in the record suggests that Makdessi could now complete the grievance process as to his claims against these defendants from June 2022. Therefore, I will dismiss all claims against them with prejudice.

C.     Claims Against Defendant Collins.

*1.     Collins' Summary Judgment Evidence.*

At all times relevant to Makdessi's claims, he was confined at Red Onion, A VDOC prison facility, and the defendants were employed there. On June 21, 2022, Collins was made aware that staff had observed inmates Makdessi and Lee Boyd Malvo on prison surveillance video accessing restricted VDOC security documents that someone inadvertently left unattended in the C-6 pod. These documents, known as post logs or orders, are to be kept away from inmates due to security concerns and the sensitive nature of the information they contain. Security staff decided that a search of both inmates' cells was warranted to determine if Makdessi or Malvo had taken any security documents or retained notes about the documents' contents. Such a search required staff to remove the inmates from their cells. At approximately 12:16 p.m., staff restrained both inmates. At Cell C-610, staff handcuffed Makdessi in front in compliance with a medical order, while they handcuffed Malvo's hands behind his back according to standard procedure. Thornesberry and another officer

-9-

escorted the inmates to the C-6 vestibule near the lieutenant's office and waited there a few minutes until Collins arrived.

As Collins entered the vestibule, he noticed that Makdessi and Malvo were standing close to each other and Makdessi was doing something with his hands. Collins told Makdessi to move away from Malvo.  Because Makdessi was cuffed to the front, and Malvo was cuffed to the back, Collins was concerned that Makdessi could use his arms to attack Malvo if he so chose.  Collins walked to Makdessi, put his hands on the inmate's left upper arm and shoulder, and walked him to the side wall of the vestibule and stood him there for about three seconds, before walking with him out the door and into C-4 pod.

Collins then escorted Makdessi across C-4 pod, with a hand on his shoulder and a hand on his arm.  Collins and another officer placed Makdessi in cell C-410, next door to the C-4 showers.  Makdessi entered that cell, but then complained that another person's clothing was there.  Collins removed the clothing items, the officers checked the cell, Makdessi reentered the cell, and the door was closed at approximately 12:22 p.m.  At some point, Collins states, he removed Makdessi's watch because the C-4 restricted housing rules prohibited inmates from wearing a watch.  Collins returned the watch to Makdessi later that day when he was no longer

confined in C-4 pod.  Collins asserts that surveillance video footage verifies his version of events.[7]

Sometime after 1:00 p.m., staff took Makdessi from cell C-410 to the C-4 pod vestibule office, where Collins discussed with him the footage showing that he and Malvo had viewed the restricted documents.  Collins told Makdessi and Malvo that he had seen them on the surveillance video looking at the Post Order.  For that reason, staff had moved the inmates temporarily to C-4 pod while Collins and other security officers searched their cells in C-6 pod for anything related to the Post Order.  After this meeting, Collins asked staff to secure Makdessi in a C-4 shower stall, which they did around 13:24, according to the video.  At that time, another inmate had been placed into cell C-410, and no other cells in the pod were available. It is standard practice to place an inmate in an empty shower stall temporarily when no other cells are available, and the shower had no running water.  According to video evidence, staff released Makdessi from the shower stall in C-4 at approximately 15:15 p.m. and returned him to his cell C-610.

---

[7] The video clips in the record from events on June 21, 2022, show as follows: (a) 220621121506_ROSP362HUC600rear360, showing Makdessi being removed from cell C-610 in C-6 pod; (b) 220621121727_ROSP375HUC400-600Shakedown, showing officers placing Makdessi and Malvo temporarily into the C-6 vestibule in front of the lieutenant's office; (c) 220621122109_ROSP342HUC400Rear360, showing Makdessi entering C-4 pod and being temporarily placed in cell C-410; and (d) 220621151553_ROSP342HUC400Rear360, showing Makdessi entering C-4 pod a second time at 13:24 hours, being secured in a shower stall, and being removed from the shower and exiting C-4 pod at 15:14 hours.

During the cell searches in C-6 pod, the officers did not find anything related to the Post Order and did not bring any disciplinary charges against Makdessi or Malvo.  Collins denies that he destroyed or tore up any of Makdessi's property or legal paperwork and did not see anyone else do so.

Collins denies that he assaulted, struck, or punched Makdessi in the C-6 vestibule on June 21, 2022.  He also denies that he twisted Makdessi's shoulder, punched his neck and shoulder, slammed him into the wall, or used force against him while escorting him to C-4 pod.  Collins states, "I placed him against the wall for about three seconds.  Nothing else happened."  Mem. Supp. Mot. Summ. J. Collins Aff. ¶ 7, ECF No. 37-1.  Collins also states that he did not call Makdessi names, use derogatory language towards him, or threaten him.  Having worked in corrections for years, Collins recognizes that inmates file lawsuits and states that he has no desire to prevent Makdessi from filing complaints or lawsuits about him or any Red Onion staff.  He denies that Makdessi mentioned any lawsuit to him on June 21, 2022.  Collins also denies preventing Makdessi from sending out legal mail to the courts.  Finally, Collins states that he did not deny Makdessi access to medical care on June 21, 2022, or any other time.

### 2.   Makdessi's Verified Response Evidence.

Makdessi's response to the defendants' summary judgment motion, ECF No. 43, is verified and must, therefore, be considered as an affidavit for purposes of

summary judgment. *Goodman*, 986 F.3d at 498.  Makdessi claims on June 17, 2022, he sent a request form to Collins, giving him "prior notice" that he was filing a lawsuit alleging excessive force used against him in 2017 and August 2020 that allegedly caused injuries to Makdessi's back and shoulder.  Resp. Opp'n 2, ECF No. 43; *Id.* Ex. 3, ECF No. 43-1.

Makdessi alleges that surveillance video shows on June 21, 2022, while he and Malvo waited in the vestibule, Collins entered the C-6 vestibule at 12:19 p.m., lunged at Makdessi without warning, wrapped his right arm and hand around the inmate's arm, placed his left hand on the inmate's injured left shoulder, then "slammed" him "into the office doorway," while Makdessi placed his left fist onto the doorway to protect his head.  *Id.* at 2.  Makdessi asserts that he yelled "you are hurting me, you are injuring my back and shoulder."  *Id.*  He claims, "Collins did not stop and turned me around and slammed me into the wall while dragging me to C-4 segregation threatening and calling me names."  *Id.*  Makdessi also claims video proves that in C-4 pod, between 12:20:53 and 12:10:58 p.m., Collins twisted his left arm and wrist because he complained that Collins had reinjured his left shoulder and back.  Makdessi also asserts that Collins never removed Makdessi's watch and that Collins mentioned doing so only as an excuse for his actions with Makdessi's arm. As proof, Makdessi alleges that the watch is visible on his wrist at 1:23 when he returns to C-4 pod and is secured in the shower.

Makdessi also claims that when he hesitated entering cell C-410, he was telling Collins that he was "in so much pain and told him he must take me to medical or call medical emergency," that his "chest & heart [were] in pain beating so fast and [felt] like [he was] having a heart attack." *Id.* at 3. Collins allegedly said "F--k you and punched or pushed [Makdessi's] injured back so hard forcing [him] into cell C-410." *Id.* Makdessi claims that he suffered severe pain in his back and legs from Collins' actions. He asserts that after he pushed the emergency button in C-410 to ask for medical care, officers took him to the vestibule at 1:10 p.m. (not on video). Collins allegedly said he would not call medical and then had officers place Makdessi in the shower where there was no emergency button and no place to sit. Makdessi claims that he collapsed four times in the shower, which he believes would be shown on video.[8]

Makdessi also asserts that he viewed video showing that at 1:35 p.m. on June 21, 2022, Collins took a legal package out of his cell in C-6 pod. *Id.* at 4. He claims Collins' failure to return that package proves he destroyed the package.[9]

---

[8] Makdessi claims that Investigator Bentley did not show him a complete security video of the C-4 shower confinement, claiming that it was defective. Resp. Opp'n at 4, ECF No. 43. But he points out that the defendants rely on this video in their brief, ECF No. 37 at ¶ 14. The video footage shows the time span between when officers placed Makdessi in the C-4 shower until around 15:15 p.m. when they released him from the shower and walked him out of C-4 pod. It is clear that someone was in the shower, but the video does not show that the person collapsed at any time.

[9] Makdessi admits that this video clip of the cell search was not provided to the court and asks the court to order and view it. The court's Order regarding production of

As purported proof of the injuries Makdessi suffered from his encounter with Collins on June 21, 2022, he offers medical records (including an MRI report) to show that he has ongoing problems with his back, shoulder, and sciatica, and that he suffers from post traumatic stress disorder and mental distress from alleged past assaults.  He submits a copy of the order placed on his cell door, stating that for medical reasons, he should be assigned to a bottom bunk on a bottom tier and always be handcuffed with his hands in front of his body.  Makdessi also submits copies of medical complaints he filed after the incident on June 21, 2022, complaining of pain in his heart, chest, back and shoulder, in addition to rapid heartbeat (tachycardia), and he provides evidence that he sought and received mental health treatment after that incident as well.

### 3.      Use of Force.

"Not every push or shove . . . violates a prisoner's constitutional rights.  The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992).  "[O]nly the unnecessary and wanton

---

the requested video clips only directed that they be provided for Makdessi's use during "any eventual trial," ECF No. 28.  As such, the only footage before the court is the group of video clips the defendants provided in support of their summary judgment motion. Because I otherwise find that Makdessi's claim concerning the allegedly confiscated legal mailing is without merit, I will not order production of the video of the cell search.

infliction of pain" rises to the level of a constitutional violation.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An Eighth Amendment claim of excessive force involves both an objective and a subjective component.  *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019).  In assessing the objective component, the court must ask whether the nature of the force used was objectively "harmful enough" to establish a constitutional violation.  *Wilson v. Seiter*, 501 US 294, 303 (1991).  "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice."  *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021).  The extent of resulting injury is one factor to consider regarding the amount of force applied and whether it was plausibly considered necessary.  *Wilkins v. Gaddy*, 559 U.S. 34, 36 (2010).

The subjective component requires a plaintiff to establish that a correctional officer "acted with a sufficiently culpable state of mind."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)).  "In contrast to the objective component, this is a demanding standard."  *Brooks*, 924 F.3d at 112.  The inmate must establish that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline."  *Dean*, 984 F.3d at 302.  To assess an officer's state of mind, I must consider four non-exclusive factors: "(1) the need for the application of force; (2) the relationship between the

need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko ex rel. Iko v. Shreve*, 535 F.3d 225, 239 (4th Cir. 2008).

Both parties ask the court to consider the video footage in the record, which does not include any audio. "[W]hen a video quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir. 2024). "Thus, at the summary judgment stage, video evidence can only discredit a nonmovant's factual assertions if the video 'blatantly' contradicts the nonmovant's position." *Id.*

Makdessi alleges that on June 21, 2022, Collins entered the vestibule giving no verbal warnings, lunged at Makdessi, slammed him into the doorway of the adjoining office, slammed him into the wall, and dragged him off to C-4 pod, twisting his arm painfully in the process and ignoring Makdessi's claims that he was being harmed by Collins' actions. Makdessi also alleges that in C-4 pod, Collins twisted his left arm and wrist, punched him, and pushed him in a cell. Makdessi presents an affidavit from Inmate Malvo, who was present in the vestibule at that time, stating that with no verbal warning, Collins slammed Makdessi into the wall

adjoining the office door.  Collins states, however, that he placed hands on Makdessi in the vestibule only to maintain order and prevent a front-cuffed inmate from attacking a back-cuffed inmate in that small space.  Collins asserts that he never slammed Makdessi against any surface, walked him to the side wall and then on into the C-4 pod, with one hand on his arm and one on his back.  Without more, these sworn, but differing versions of events present material disputes of fact under the summary judgment standard.

Unchallenged video footage of an event can overcome such disputes, however.  *Simmons,* 106 F.4th at 385.  I have carefully observed the video of events in the vestibule and in C-4 pod on June 21, 2022.  The video shows that when Collins entered the vestibule on June 21, 2022, at 12:19:35, he walked over quickly to hold Makessi's left arm, with the stated intent to keep separate a front-cuffed inmate from a nearby back-cuffed inmate (Malvo).  The camera's view of the initial interactions between Collins and Makdessi is partially blocked by the metal detector for a few seconds, but the footage does not depict any aggressive movements by either Collins or Makdessi.  The video then shows Collins leading Makdessi by the arm at a slow walk to the side wall, away from Malvo, and holding him there for a few seconds before walking with him out of the vestibule.  On the way out, the footage shows Collins with one hand on Makdessi's back and one hand on his arm.

The video of Collins escorting Makdessi into C-4 pod similarly shows the officer with one hand on Makdessi's arm and one hand on his back as they walk calmly across the pod.  The footage shows them stop at the entrance to Cell C-410, Makdessi steps inside briefly and then steps out.  Collins enters and then throws some orange clothing out onto the pod floor, and then Collins and Makdessi stand in the cell doorway for a few seconds before Makdessi enters the cell again, and the door closes.  Again, the footage does not depict any sudden or aggressive moves by Collins against Makdessi.

In short, the video footage in the record directly contradicts Makdessi's claims that Collins slammed him into a doorway or a wall in the vestibule, twisted his arm or shoulder with the intent to harm him, punched him at any time, dragged him anywhere, or pushed him into Cell C-410.  Rather, the video footage shows Collins use his hands placed on Makdessi's arm and back to guide him and maintain order — first to ensure that Makdessi did not attack Malvo and then to lead Makdessi to cell C-410 for temporary placement during the cell searches warranted by evidence that Makdessi and Malvo had earlier viewed restricted documents.  Video of the walk from the vestibule across C-4 pod at around 12:20 shows that Makdessi was walking normally and without any physical assistance.  Moreover, after a second

short meeting with Collins in the vestibule that is not on video in the record,[10] the available footage shows Makdessi reentering C-4 pod around 13:23, walking without difficulty to the shower area, and two hours later, depicts him at around 15:15 walking without assistance from the shower area across C-4 pod on his way back to his cell in C-6 pod. His appearance and behavior on these video clips could not cause a lay person any apprehension about his physical condition or signal any need for immediate medical attention.

Indeed, the video does not support a finding that Collins used anything more than the de minimis force of using his hands on Makdessi's arm and back to guide him away from Malvo, out of the vestibule, and across the pod to a temporary holding cell. Force of such a nature is not repugnant to the conscience of mankind and is de minimis and thus insufficient to satisfy the objection prong of the excessive force analysis. *Hudson*, 503 U.S. at 9–10. Similarly, after watching the video, no reasonable juror could conclude Collins took any action against Makdessi "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Dean*, 984 F.3d at 302. After all, Collins reasonably perceived a potentially threatening situation, having Makdessi (front-cuffed) in a small space with Malvo (back cuffed), which created a

---

[10] Makdessi does not allege that Collins used any physical force against him during this second encounter in the vestibule.

need for some intervention.  Collins tempered his response by stepping quickly between the two inmates and holding onto Makdessi to prevent any altercation between them.  Video confirms that Collins's measured actions were reasonable and proportional to address this perceived threat.  *Iko*, 535 F.3d at 239.  For these reasons, I conclude that Collins is entitled to summary judgment as a matter of law as to Makdessi's claims that he used excessive force against him on June 21, 2022.[11]

### 4.    Retaliation.

Merely conclusory allegations of retaliation cannot suffice to state any actionable claim under § 1983.  *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).  Courts must treat an inmate's claim of retaliation by prison officials "with skepticism because [e]very act of discipline by prison officials is by definition retaliatory in the sense that it responds directly to prisoner misconduct."  *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996).  To succeed on a § 1983 retaliation claim, Makdessi "must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's

---

[11]    Makdessi also claims that at various times on June 21, 2022, Collins used derogatory or profane language towards him.  Collins denies doing so.  In any event, mere words, however abhorrent or disturbing, do not violate an inmate's constitutional rights.  *Morrison v. Martin*, 755 F. Supp. 683, 687 (E.D.N.C.) ("The subjection of a prisoner to verbal abuse or profanity does not arise to the level of a constitutional deprivation," and "[m]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations"), *aff'd*, 917 F.2d 1302 (4th Cir. 1990) (unpublished).

conduct." *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017)).

To meet the first element of the retaliation analysis, the plaintiff must show that he exercised his First Amendment rights. Prison officials may not retaliate against an inmate for exercising his constitutional right to access the court, *Hudspeth v. Figgins*, 584 F.2d 1345, 1347 (4th Cir. 1978), nor may they take actions that violate his "First Amendment right to be free from retaliation for filing grievances." *Booker*, 855 F.3d at 541.

The second, the adverse action element of the retaliation standard is objective. Specifically, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). The plaintiff's continued exercise of his rights in the wake of the alleged retaliatory conduct "provides some evidence" whether that conduct tended to "chill First Amendment activity," but such evidence alone is "not dispositive" of this objective element of the analysis. *Id.*

The third element of the standard requires the plaintiff to show a causal connection between his First Amendment activity and the alleged adverse action. A plaintiff must put forth evidence to show that his "protected conduct was a substantial or motivating factor in a prison guard's decision to take adverse action."

*Martin*, 977 F.3d at 300.  "[T]emporal proximity" may be "enough to sufficiently make a prima facie showing of causation."  *Riddick v. Mickles*, No. 7:20-CV-00559, 2023 WL 2759069, at *9 (W.D. Va. Mar. 31, 2023).  At this point in the retaliation analysis, the burden of proof shifts to the defendant to show a "legitimate, nonretaliatory reason for taking adverse" action against the plaintiff.  *Id.*  If the defendant does so, the plaintiff then must resume the burden of proof and must show by a preponderance of evidence that the defendant's stated reason is merely a pretext for unlawful retaliation.  *Id.*

Makdessi has presented facts to satisfy the first prong of this analysis, exercising a constitutional right.  He has presented evidence that he had prepared a lawsuit and had filed a "Prior Notice of Lawsuit" request form addressed to Collins dated June 17, 2022.  Resp. Opp'n. Ex. 3, ECF No. 43-1.

As to the second prong, Makdessi alleges two potential adverse actions — Collins' purported uses of force against him on June 21, 2022, and Collins' confiscation of his lawsuit ready for mailing.  I cannot find that the alleged physical assaults qualify in this case as sufficiently adverse under the retaliation analysis.  As stated, video in the record belies Makdessi's claims that Collins physically assaulted him or took any action intended to harm him on June 21, 2022 — in the vestibule, en route to the temporary C-4 pod cell, or by holding him in the C-4 pod shower for two hours while searching his cell.  *Simmons*, 106 F.4th at 385.

Moreover, the third prong of the retaliation analysis is the definitive downfall for Makdessi's retaliation claim concerning Collins' uses of force and the cell moves. As I have already found, the video contradicts Makdessi's account of Collins' uses of force. And the defendant has put forward an undisputed and legitimate basis for moving Makdessi to temporary quarters in C-4 pod on June 21, 2022 — to search his cell and determine whether he had kept any notes or portions of the restricted documents that he and Malvo had reviewed. Preventing inmates from possessing information that would create a potential security risk was worthy of some limited restraint and housing disruption to the inmates involved until the risk was investigated or eliminated. Collins has also explained that he held Makdessi for a couple hours in a shower only because no other cells in the area were available at the time. Makdessi has offered no evidence that the reason Collins gave for the temporary housing accommodation or the cell search was merely a pretext. Therefore, I find no dispute of fact on which Makdessi could persuade a factfinder that Collins' motive for his actions or the cell moves was retaliation, rather than ensuring institutional security.

As to Collins' purported confiscation of a lawsuit mailing, Makdessi fails to show that this act qualifies as an adverse action, even if Makdessi could prove by video that it occurred, as he alleges. The court's own docket shows that barely one month after that alleged confiscation, on July 24, 2022, Makdessi signed and dated

a lengthy § 1983 Complaint against Collins and more than two dozen other prison officials, including the claims in this case; the court received and docketed that Complaint on July 29, 2022, and docketed it as No. 7:22CV00428. Makdessi has pursued claims stemming from that Complaint ever since. Thus, I cannot find that losing access to the packaged mailing on June 21, 2022, chilled Makdessi's exercise of his right to access the courts to the extent of a constitutional violation. I will grant summary judgment for Collins on Makdessi's retaliation claims.

### 5.   *Medical Needs.*

Makdessi alleges that Collins knew on June 21, 2022, that his actions had aggravated Makdessi's physical problems. Indeed, Makdessi states that he verbally informed Collins of his pain and sought medical attention before being placed in Cell C-410. Collins denies that Makdessi, at any time, complained that Collins' actions had injured his shoulder, back, or legs. Collins Aff. ¶ 15, ECF NO. 37-1.

The Eighth Amendment's protections against cruel and unusual punishment include a right to the medical care necessary to address an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

The medical need portion of this legal standard is objective. It requires facts showing that the inmate's medical condition is "serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The deliberate indifference portion of the constitutional standard is subjective. The plaintiff must show that each defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's action or inaction. *Jackson*, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable."). "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015) (unpublished).

The video footage in the record directly contradicts Makdessi's claim that Collins knew he needed medical attention before being held for a couple hours in C-4 pod.  It shows Makdessi walking without assistance or apparent difficulty when leaving his cell, in the vestibule, or in crossing C-4 pod to the temporary cell or shower area.  Even assuming that Collins knew of Makdessi's prior physical problems, Collins is not a medical professional.  Moreover, Makdessi's movements depicted on video are not of a sort to signal to a lay person that he had any serious medical need for immediate attention.  Similarly, no reasonable juror could conclude from the video that Collins knew his actions on June 21, 2022, would or did substantially aggravate Makdessi's medical issues so as to create excessive risk of harm if Collins did not ensure that he received immediate medical attentionwhile in C-4 pod.  *Jackson*, 775 F.3d at 178.  Thus, the video of these events contradicts Makdessi's claim that he had a serious medical need for immediate medical attention, or that Collins knew that failure to provide access to immediate medical care placed Makdessi at an excessive risk of harm.  *Sharpe*, 621 F. App'x at 734 (requiring  evidence that delay of medical attention aggravated or unjustifiably prolonged inmate's pain).  On this evidence, no reasonable juror could find that Collins acted with deliberate indifference to Makdessi's serious medical needs on June 21, 2022.  Thus, I conclude that Collins is entitled to summary judgment as a matter of law as to Makdessi's claim that Collins denied him necessary medical care.

III.   CONCLUSION.

For the reasons stated, it is hereby **ORDERED** that (1) the Clerk shall amend the docket to indicate that Blevins is the correct spelling of the last name of the defendant identified in the Complaint as Blevens, and (2) the Motion for Summary Judgment by defendants Collins, Blevins, and Turner, ECF No. 36, is GRANTED.

A separate Judgment will be entered on behalf of the defendants.

ENTER:   October 8, 2024

/s/  JAMES P. JONES
Senior United States District Judge